The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Sit down. You ready? Thank you, Your Honor. May it please the Court. The question for the Court is whether Atrium Health, a multi-state healthcare enterprise generating $11 billion a year in revenue, is a local government entitled to complete immunity from antitrust damages. There are lots of reasons why it is not, but we think three are especially strong. First, to fall under the statute, a special function governmental unit must have been, quote, established by state law in one or more states. Atrium, however, was not established in the laws of several states where it operates, including Georgia and South Carolina. Congress could not have intended to allow a single state, like North Carolina, to authorize the creation of corporations that could then do business across the nation, free from any need to pay back citizens of other states that they injure. Instead, when, as here, an entity operates in multiple states, it must have been, quote, established by state law in one or more states, the states where it operates. There are essentially two options under the statute. It could be established by state law in one state, or it could be established by state law in more than one state. But you can't be established under the state law of a state and then operate wherever you want. Second, Atrium has limitations on its powers that just belie its claim to governmental status. We think the most important one is that if Atrium is held liable for antitrust damages, it has no way to pass that liability on to taxpayers. The LGAA was enacted precisely to ensure that antitrust liability would not bankrupt local governments. And you can see that actually in the structure of the statute, although it's also all over the legislative history. It doesn't prevent antitrust liability. It only prevents the payment of any kind of money, not just damages, but also attorneys' fees or costs. It's all about protecting the public fisc. And third, and I think this is also very important, the statute actually, the LGAA, has a section that is devoted to things like what Atrium claims to be in its brief, which is an instrumentality of or an agent of Charlotte. Now, query whether that's true. I'm not sure why an agent of Charlotte is providing health care services in Georgia. But even if it is, Section 36 says that a person can also claim an antitrust damage immunity under the LGAA if their actions were directed by a municipal government. And the reason that we're not arguing under that section is that there's no argument that Atrium's anti-steering provisions are directed by the local government. But that is how something that is an instrumentality of or connected to or supervised by a municipal government might be able to claim immunity. It does not thereby become a local government that is per se immune from damages under Sections 34 and 35. I'm inclined to say that if there are no questions, I don't have anything else to begin with. Mr. Citrin, I have a question. From reviewing your materials, at least in the briefs, you hadn't really talked about it quite as much today. But you find significant that language in B, that other special function government follows school district and sanitary district. And that under the rule of statutory construction that you cite to, the general should be interpreted by the specific. Is it clear or certain that a school district or a sanitary district would necessarily possess the powers you say must exist for a special function governmental unit? I say that because these entities are creatures of state laws and state laws aren't all the same. So I'm interested in how you conclude that a school district and a sanitary district necessarily have the power to tax, have the power to issue general obligation bonds, and have the power to exercise eminent domain independent of another state agency. Sure, it's a great question. And I want to answer both with something specific and then a more general discussion, which I hope will be responsive to your point about how state law varies. The specific point is, you might take a look at the statute in North Carolina that creates sanitary districts. It's Section 130A-55. And I'll just point out that the third power listed is a general power to raise taxes. The fourth power listed is the unrestricted right of eminent domain to acquire property by condemnation. There's a further taxing power that's in Section 15. And then Section 16 is something very close to an ordinary police power. It's a power to, quote, make rules for the promotion and protection of the public health. So sanitary districts are, you know, very recognizably like governments in a way that something like Atrium is not. Now, your more general question is about how we know that, like, in general, I think a sanitary district or school district would be like that. And, you know, what this calls to mind is, I don't know if the Court has a lot of experience with ACCA, the Armed Career Criminal Act, which is another federal statute that tries to incorporate a bunch of state law crimes that will all vary. And the way that the Supreme Court has taught us to understand statutes like that is to look to what the ordinary version of burglary would be or the ordinary version of, I can't remember what the other crimes are right now. So, you know, I think what you would ask is whether a typical school district or an ordinary sanitary district would have these kinds of powers associated with them, not whether every sanitary district or school district in the nation has it. And I don't think, I think it's pretty clear that an ordinary school district or ordinary sanitary district would have at least one of the characteristics that we described. We're not saying they're all necessary. Really, any of them might be good enough. And certainly school districts, right, they must have some recourse to the taxpayers because they provide education for free. So unless they have some access to revenue, they won't be able to provide their function. And sanitary districts, like I said, they not only usually have a taxing authority and other authorities, they often have something like the police power because they have to govern how residents will dispose of their trash and how they have to maintain their property. And they also often have to condemn areas for sewer lines and things like that. In North Carolina, sanitary districts can even create things like fire departments that raise taxes to pay for them. So they're pretty different. May I ask you a question? I'll admit that this is really not a hypothetical, so be careful. It's almost, it's a counterfactual, really. So with that proviso, be careful. Judge Gregory, I apologize. Can you hear me now? You started clipping, so I missed the whole beginning of what you said. I'm going to ask you a counterfactual. It's really not a hypothetical, so just be aware of that. In 1943, when this was formed, in its nascent years, if it had never grown geographically beyond the boundaries of the standard medical metropolitan district area or anywhere near the amount of money, the net revenues, would there be any problems with this falling under the local government antitrust act? It's an extremely difficult counterfactual to answer, in part because the local government antitrust act has passed 40 years later. That's what I'm saying, because I want to see where, if anything, did it, in its formation, in terms of what original powers it has, assume that it exists, would that be any problem? Or is it merely solely geographical and fiscal growth that's the problem? I think it would still be a serious issue that when it was created, it was created as an alternative to a municipal hospital, which would have recourse to taxpayers, and instead is set up as something that has no recourse to taxpayers. That's a very important clue that it may not be what the local government antitrust act considers to be a local government. And then the fact that it also lacks eminent domain power is a further indication. But the fact that it is closely circumscribed under original law to the boundaries of the municipality that creates it does make it much closer a case. So I'm not sure I could commit to the idea that it would be, although, of course, not important for this case. But I will say it's much closer under the law as it originally existed in 1943, whether or not something that was essentially circumscribed to Charlotte or 10 miles outside Charlotte would be a local government in a way that something with the power to operate in Alaska is not. Does that answer the question? I apologize. I'm not trying to weasel out of the hypothetical. It's a hard question. Judge Keenan has a question. Okay. Mr. Citrin, I'd like you to address the DCSR case, the North Carolina Supreme Court case, because I realize it was decided under state antitrust law. But it seems like a lot of its reasoning might be pertinent here. So could you please tell us why, in your view, it is or is not persuasive? Yeah, I think it's persuasive on its own terms. It's just very important to recognize that what it's mostly answering is the question whether a quasi-municipal corporation is a corporation for purposes of the state's antitrust laws. And it's not actually answering the federal law question that we care about, which is whether or not it counts as what Congress had in mind as a local government at the time. And this is really important in part because of the federalism aspects of reading the LGAA the way that the defendants have asked you to read it. You know, if it was just a question of whether you were stood up by a municipal government for a public purpose, you would create a situation where the state of North Carolina, if it wanted to, could immunize firms founded in North Carolina for their antitrust damages that they cause in other states and around the nation. And that has to be a federal question, and it has to be focused on what Congress cared about, because otherwise you'd permit state legislators, state courts, even municipal entities to attach a label to something without giving it any actual governmental powers over its people or anything like that, and thereby immunize it for its out-of-state operations. I'll just point out also that for federal law purposes, it would be very weird to think that this was a local government, in part because the activity that it was engaged in here was so bad that it was not sued just by the federal government, but also by the state of North Carolina for harming the people who use the health system. So, you know, it is odd to think of a local government that isn't responsive to the state and isn't responsive to its local residents, but has to be sued, you know, in order to start complying with federal antitrust laws. Right, but the injunctive relief is still available. That's right. The injunctive relief is available. But I think the point is they had to go bring a lawsuit. They couldn't vote, you know, to stop doing things that way. The state couldn't direct it to stop doing things that way. It was acting like a firm would act and not like a government would act. Okay, well, let me just ask you the last follow-up, and this is on page 35, going over to 36 of the slip opinion of the Carolina case, where the courts really relies on the fact that the hospital authority has the power to acquire real property, to issue revenue bonds. It's subject to annual audits, and the court seems to focus on the kind of the day-to-day functioning and the powers of this entity, and why wouldn't those be relevant in the federal context? I understand they're two different sources of law, but why aren't those concepts, why don't they correlate to what we're doing here? Yeah, so one really important point is that if we're talking about the way that it's subject to audit or the public records law, stuff like that, things that aren't the powers of the corporation, but the powers of the state and municipality over it, right? Those are captured by the federal law through section 36. The statute has a section that's about control by local government, and it has a condition that the action has to be directed by the municipality. And it's reading that condition out of the statute, right, in a way that does not respect Congress's text to say that you don't have to be directed by, because it has these oversight powers, right? That's backwards. You all clipped for a second there. Could you hear that? We heard you. You just froze. As long as you heard me, I think that's the important part. The other part of my answer to Judge Keenan's question is that the powers that are described there, the power to acquire property or the power to, you know, raise revenue on your own, raise, to issue bonds on the promise of your own revenue, those are powers that are shared by private corporations and that Congress would have thought of as non-governmental powers. If you think of an ordinary national corporation like Bank of America, it can acquire real property and it can issue bonds on the promise of its own revenue. So when Congress has something in mind, it's not powers like that. It's powers that you would associate ordinarily with government, the power to have recourse to taxpayers if you incur liabilities, the power to take property on your own say-so from private citizens, or, you know, the police power, the power to actually issue regulations and control people's lives. And I just point out that the very last sentence of that paragraph, it does say, we are satisfied that the hospital authority is a quasi-municipal corporation rather than a for-profit corporation coming within the purview of NCGS Section 7516. So the tension that they, that state law cares about is between the hospital, the quasi-municipal corporation and a for-profit firm. But federal antitrust law has rejected that. There is no need to be a for-profit firm. To be subject to antitrust law, you can be a non-for-profit firm. And that's because, you know, of the lavish salaries that, you know, frankly, the executives at Atrium Health will sometimes earn from, you know, growing their empire. I'd like to reserve the balance of my time if I can. All right. Thank you. As you sit, Jay. Mr. Cooney. Thank you, Your Honor. Let me begin by saying what the plaintiff is asking this court to do is to create an area of federal common law that hasn't existed since the passage of the LGAA. He's asking the court to dictate federal standards for what a special function governmental unit established by the state is. And in doing so respectfully, he's made a number of statements that are simply incorrect based on the record. First of all, the hospital authority has the power of eminent domain and has the power of eminent domain as a public condemn norm, not as a private condemn norm. It's lumped in with all the other public condemn norms. And in fact, the hospital authority's property cannot be taken by eminent domain without its consent. In addition, the hospital authority has such additional powers such as closing streets or maintaining parks or doing things that are associated with the public health function. So when you read through that long list of powers that are given to the hospital authority, you see a lot of powers that do in fact look like those police powers he's talking about. Now, Judge Keenan, I think you asked the right question about the impact of the CSER because this case turns on 13 words in the local government antitrust act. And those 13 words are whether the hospital authority is a special function governmental unit established by state law in one or more states. So we begin with the fact that whether it's a special government, a special function governmental unit is established by state law. It's not a matter of federal law. You look to state law. And when you look to page 37 of the CSER opinion shortly after the section you referred to, Judge Keenan, about the middle of the page, the court finds in several places that the hospital authority is a quasi-municipal corporation. And then Justice Ervin describes what a quasi-municipal corporation is under North Carolina law. He says quasi-municipal corporations are agencies which have been specifically created by the General Assembly by means of a legislative delegation of authority to carry out the governmental purpose of providing a service for the benefit of the public, which the legislature is not as well positioned to carry out itself. In this sense, quasi-municipal corporations are an extension of the government that have been created to more efficiently and effectively manage the provision of necessary services to the public. Although quasi-municipal corporations are not subject to all the requirements applicable to other governmental entities, it is clear that their essential function is at its core the governmental provision of services. I can't think of a clearer expression by a state that this is a special function unit of government than that description. Judge Gregory, you... I'm getting some feedback and I apologize. Judge Gregory, you... Judge Qualibam has a question for you. Oh, I'm sorry, Your Honor. That's okay, Counsel. Can you hear me okay? I can, sir. Okay. I think I understand your position about how your client qualifies as a special function governmental unit. My question is, is there, in your view, if it was created as such and maybe even remains as such under state law, is there any point in its growth that might take it out of a local government definition? Is there anything that... I mean, here we're in three states, allegedly, and if you're in 50 states, if you're international, is there any point at which, even if you were qualified and remain qualified under state law, that you lose that designation? Or is it your position, as long as it makes that and we go do whatever, you know, we're still protected by something under the title local government? So let me respond to that in a couple of ways. First of all, we actually have an example of that in the capital freight case in which the government of Puerto Rico established a quasi-municipal agency that paired up with a private agency to basically run all the cargo shipping between Puerto Rico and all the states of the union and internationally. So by definition, that company operated in all 50 states and it was found to be a special purpose unit of government. Now, specifically on this case, what I'd like to suggest is the plaintiff is presenting you an issue that you don't need to decide yet. Now, the hospital authority is alleged to have market power in only one state, North Carolina. Any anti-competitive actions that have taken place were alleged to have taken place only in one place, North Carolina. These contracts were entered only in one place, in North Carolina, and the plaintiff received all his treatment in North Carolina. If at some point in the future, the hospital authority were to have, say, market power in Georgia, Your Honor, and was sued in Georgia for acts that it took in Georgia, I think that's a different question. Now, you may reach that answer that because it's been established in North Carolina, that might carry over, but you wouldn't necessarily need to reach that answer because it's not operating as a hospital authority in Georgia or in South Carolina. It only operates as a hospital authority in North Carolina. So I think the plaintiff, in an attempt to get you to embrace a federal common law here, is asking you to decide a question that's not before the court. What's before the court is on this complaint, on these allegations of North Carolina contracts, North Carolina antitrust injury, North Carolina special function unit of government. Does the hospital authority qualify? And that is yes, but that doesn't necessarily dictate what may happen in the future should the hospital authority have market power in South Carolina or in Georgia. The other thing, Judge, that I would point out is the LGAA itself seems to contemplate that a special function unit of government would do business in more than one state. Because it says that. And we know the Massachusetts Port Authority and other port authorities and regional planning authorities all operate across state lines. And of course, as you well know, Charlotte and the Charlotte Hospital Authority operates right on the state line with South Carolina. A lot of patients come in from South Carolina. One of the powers that was given to the hospital authority by the General Assembly was the ability to provide health care services outside the state of North Carolina. So it's well within its function to do so and needs to do so to treat everyone who comes. The hospital authority doesn't ask for an ID when you show up at the door. It treats you. And it needs to be able to provide that treatment across state lines. That was contemplated by Congress. So respectfully, I think he's trying to get you to decide something that's not before you. Finally, all the references to Georgia. I'd point out that none of those have anything to do with this lawsuit in this sense. It's undisputed that as a result of a settlement with the United States government, these anti-steering provisions were stopped being enforced in November of 2018. The transaction into Georgia didn't occur until January of 2019. It wasn't operating in Georgia during the time period of the complaint. And as the Tarabishi case makes clear, which they rely on so heavily, it's the time period of the complaint that dictates what the entity is. In Tarabishi, you might recall, the public trust hospital there was excluded from the definition of a political subdivision for a two-year period from 1985 to 1987. They were later added to that definition. But the court said the fact that they were later added can't affect the complaint because the complaint was for a specific period of time, even though once they were added, they would have reached a different result in Tarabishi. We have claims here in 2016 about contracts that were entered into before 2016 at a time when the hospital authority was not operating in Georgia, and there's no allegation in the complaint. It was operating in Georgia. So respectfully, that really is a red herring. Now, Judge Gerger, I would like to address your question about size. Because you indicated that can a sub-state entity become a certain size and lose that character? And of course, the plaintiff compares the size of the hospital authority to the size of the city of Charlotte. But what they don't do is compare it to the size of the counterpart. So the hospital authority has to negotiate with four private insurers. Those four private insurers control 85% of the private insurance market. Every one of those insurers has revenues or assets that's worth the hospital authority. The reason the hospital authority needs size is so that it can hope to achieve somewhat of a level playing field with insurers, and the state of North Carolina understood that. Because if you're a small rural hospital, you can't negotiate with Blue Cross Blue Shield of North Carolina and get a reasonable rate, let alone Cigna or Aetna or UnitedHealthcare, and that's why they're closing all over the state. You need enough size to be able to act as a counterparty for that. And size is important, too, because it enables you to do things. Charlotte is the largest metropolitan area between Washington and Atlanta. If it wasn't for the hospital authority, Charlotte wouldn't have a level one trauma center, wouldn't have a solid organ transplant, it wouldn't have the advanced cancer services, all of which are made possible because you've achieved a certain size, all of which go to the benefit of the citizens and residents of North Carolina. So if you start drawing arbitrary lines that how big is too big and if it gets too big, you're going to, particularly in health care, you're going to deprive the citizens of a lot of opportunity to get the kind of quality health care that the largest metropolitan area within 300 miles is entitled to. Mr. Citrin keeps making the point that, well, taxpayers won't have to pay for any judgment he gets. And that's right, but up to a point. It's right in the sense that, yes, the city of Charlotte is not going to have to write a check for any judgment that he may obtain. But it's wrong in the sense that any judgment he obtains is going to be taken out of public assets because the assets held by the hospital authority are public assets. They revert back to the county and the city when the hospital authority either goes out of business, ceases to do business, can't do business, or the state of North Carolina decides to undo its creation. But these are public assets. This is a public body. And so any judgment is going to be taken out of those public assets. And I don't believe Congress intended the thing to be so narrow that as long as taxpayers are not having to pay, then it's not a local government, a special functioning unit of local government. Yes, yes. Mr. Cooney, you had said earlier that making the point that the hospital authority only operates as a hospital authority in North Carolina. It doesn't operate as such in Georgia. How would you characterize the nature of its operation in Georgia, then, if it's not a hospital authority? What is it doing there? Well, structurally, well, let me answer that in two parts. So structurally, from a matter of legal formalities, the hospital in Georgia, which it didn't get until 2019, owns its own assets and is a part of a limited liability corporation. The hospital authority is the sole member of the limited liability corporation. But the hospital authority does not own those assets directly. Those assets remain the property in Georgia. And the Georgia attorney general had to approve the transaction. Let me go back to the implicit question you made about what you're doing in Georgia. And I think to put a finer point on it, the question may be, how is operating a hospital in Georgia help the citizens and residents of North Carolina and Charlotte? If I think that's... Yeah, and to follow up on that as part of your answer, because if it can't exercise its quasi governmental powers in Georgia, it can't exercise the power of eminent domain, it can't issue Georgia revenue bonds, then what is the nature of its operation? Well, as I said, the nature of its operation is more in terms of a management function. And this gets to how it benefits North Carolinians, because health care in general, but hospitals in particular, have very high costs. And so what you want to do is you'd like to spread those costs out among as many people as possible to lower the operating costs. And that way you lower the prices. So for example, for Navicent, they don't need a freestanding legal department. There's a shared services legal department. There's shared services accounting. For purchasing in particular, once you get to a certain size, you can demand larger discounts on hospital beds, on PPE, on surgical suites, on x-ray machines, on the things that make a health care system function. So the larger that system can become, the more of a discount you can get on the operating side, which lowers your cost of operation and therefore can lower the prices overall for all your patients, including those in North Carolina. But Judge Keene, I think you're bringing up an excellent point. And it goes to what I started off by saying. You don't have before you a claim that in Georgia, the hospital authority entered into contracts that violate the antitrust laws as a result of its market power. And if you get that claim someday, then I think your point is well taken. Because I think the court would be willing to, would be, it makes perfect sense to demand that if you seek an exemption from antitrust damages for actions that take place in a given state, you operate as a special function unit of government in that state. But that's not this case. And I think it's important to understand that it's not this case. And I think it's also important to understand that the courts have routinely recognized states can, or that these special function governmental units can function in more than one state. And Congress anticipated that. It meant to include regional planning commissions, regional environmental commissions, regional transport entities. The Charlotte Douglas Airport Authority, I think, is a classic example of that. None of those authorities meet their definition of a government. And I think that's the other flaw in their logic. They keep wanting to refer to the Charlotte Mecklenburg Hospital Authority as a government so that people say, well, of course, it's not a government. Congress was more sophisticated than that in the statute. Congress realized there were two kinds of entities to protect. One was a general purpose governmental entity. And those general purpose governmental entities in subsection 1A are cities, counties, towns, parishes. What we would think is government writ large. Those are general purpose government entities. But Congress also understood that since at least McCullough against Maryland, we've had quasi-municipal corporations that the states have created and stood up and delegated functions to in order to provide public benefits for public purposes that are not general governmental entities. That's what the hospital authority is. So to say, well, how is it like a government is asking the wrong question. It's going to lead you to the wrong answer. Mr. Cooney, we're not at the question of whether or not Georgia's operations somehow may have a different result in terms of litigation or liability. But what do we do with the word local? Local is really not defined by the amount of money you make. Local is local. And for example, that's the case. New York City is huge. I mean, it must have an operating budget of several, well, triple-digit billions. But it still could be local if it's only contained in the five boroughs. So it's not the amount of money. But when you're talking about an operation like you have here, Atrium, is it, in a sense, no longer local, notwithstanding not the metric of money, but just the metric of footprint? And that aspect of it is no longer local because it's far-flung. So it's not a question of whether or not this question touches Georgia. The question is, is somehow has it morphed to no longer local? Would you respond to that? Well, yes, Your Honor, and I think that's an excellent question. Congress anticipated that these special-function governmental units would operate in more than one state. And Atrium, by virtue just of physically where it is, has to operate in North and South Carolina. It just has to. Well, perhaps that was because they were anticipating perhaps two states may get together and somehow do some kind of joint venturing together. But it would still be local as to those entities. So that's still. Go ahead, go ahead. Yes, but Congress is not limited to that. They didn't say states have to get together. And there's certainly nothing in the legislative history that indicates you have to be in each state a special-function purpose of government. What Congress specifically considered and what the courts have said, you know, for instance, I go back to Zapata and Capital Freight, where, again, you've got this Puerto Rican entity that effectively operates in all 50 states. And there's no way you could describe that as local. But the courts had no problem saying it still meets the requirement of special-functional government unit established by a state, in that case, Puerto Rico. So I think you would be engaging in a reading that no other court has engaged in to say the local controls what's established by a state and local imposes some border restriction at some point. But what's the difference between the Massachusetts Court Authority operating among four or five states because of where it's regionally located, and the hospital authority having to operate in North Carolina and South Carolina because many of its patients come to it from South Carolina? Well, aren't most of those authorities, they have signatories by each state that participate in those authorities? Well, not necessarily. I mean, most authorities have their – for instance, there's a New York Port Authority. There's a New Jersey Port Authority. Now, they cooperate with each other, but New Jersey is not a member of the New York Port Authority anymore. The New York is a member of the New Jersey Port Authority. So they certainly probably have cooperative arrangements, but the port authorities themselves are established in the state, by the state, as a special-function unit of government. Same with regional planning commissions and environmental planning commissions. As a legal form, we have to go back to what the statute says. Has this been established by at least one state as a special-function governmental unit? And I apologize because I've run over my time, sir. No, no, no. You are answering questions. Any further questions of Mr. Cooney? All right. Thank you, Mr. Cooney. Mr. Citrin, you have some time reserved. I'd like to start with the very last point that Mr. Cooney was making because I think it's really important that he did not give you the statutory text. He gave you a paraphrase of it, which is not accurate. It does not say established by state law in at least one state. It says established by state law in one or more states. And what that is contemplating is an entity that might be established by state law in one state or it might be established by state law in more than one state, but not an entity that is established by state law in a state and then operates wherever it wants to. That's a corporation, a firm, right? Bank of America can be incorporated under state law in Delaware and then provide banking services wherever it wants to. And that is a core textual difference. It is important to attend to the words Congress actually used and not give them a gloss like at least one state or something like that. If that's what Congress had meant, it didn't even have to say one or more states. It could have just stopped at established by state law. And then Mr. Cooney's argument would hold. But that's not what it said. It clearly contemplated things like WMATA in Washington, D.C. and Maryland and Virginia or the New York-New Jersey Port Authority, which is one entity. It has a single CEO and not things like Atrium that are just operating wherever they want to. Mr. Citron, if I could kind of stop you there, because as I read it, I don't think it reads so clearly in your favor or so clearly in Mr. Cooney's favor. I'm not sure exactly what that means, to be honest with you. And which kind of, I guess, brings me to this question. And the fact that it says in one or more states, you're right. It may be something like a joint operation, like a local transit authority or something like that. But it seems to me that it doesn't exclude an entity operating in one or more states. And I guess my concern is, I feel like, you know, I wonder whether you're asking us to impose limitations on this statute that are really Congress's job. I mean, it seems like in the first instance, you're asking us to impose some kind of hierarchy of governmental unit, one that has, you know, certain powers that at least isn't expressly in the text. I mean, I understand how you get there. And now you're asking us to impose some limitation on operations. It may make a lot of sense, by the way. I'm not suggesting it's illogical or bad policy, but I don't see it in the text. And so I'm wondering whether you're asking us to essentially do a modification of the statute. Certainly not. I do think that the reading that I've offered of established under state law in one or more states is the better one. But put that aside. The word local government is in the statute. Mr. Cooney said there's only 13 words that matter. That's not right. Okay. Local government matters. And the Supreme Court has told us this over and over again. We cite Leocal in our brief, but the Bond case would be another great one to look to. Right. That was a case where the underlying statute was about chemical weapons. Right. And the definition was something like any toxic chemical. And so someone was prosecuted for using a toxic chemical because it met the definition. And the Supreme Court was like, but no one would describe household bleach as a chemical weapon, even though it meets the definition. This is that case. It is impossible to describe atrium as a local government. And that's important because those are the words Congress used. Okay. Well, Mr. Citrin, then to follow up on Judge Quattlebaum's question. And it's something I do pretty much every time I listen to lawyers' arguments. I try to figure out, okay, how we're going to write this opinion. We're going to write it if we agree with you. How big is too big? And how do you write that in the context of a court decision as opposed to, as Judge Quattlebaum's saying, legislative amendments? Yeah. So I think the easiest way is just to note that unlike any other local government I've ever seen, atrium has the power to operate in any state where it wants to. And that power was granted in 2015. I'm not saying it stopped being local because it built or bought hospitals in Georgia. It already had hospitals in South Carolina long before that. I'm saying it's not local because the North Carolina legislature decided to allow it to operate wherever it wants to, which is not something you do with a local government. Right? Charlotte doesn't, you know, sell sandwiches in Alaska or whatever. It provides services to local residents. It's providing its services not to local residents in non-contiguous areas of states on the other side of other states. Right? That's not local within any meaning of the word, and that's all you'd have to say to decide it. The other point we've made is not that, you know, one particular power, the taxing power, the eminent domain power is necessary. It's just that you'd have to have at least one of them. But none of the things that are typical only of governments seem to be true of atrium. So that's the other important point that I would make, you know, if I were trying to craft the opinion that way. But I think local does all the work. At the time that this statute, 75 years ago when this was created, it was local. It was limited by statute to operating within the municipal boundaries or within 10 miles of it. Now it's not local. And that is by a change created by the legislature in 1993 to allow it to operate anywhere in the state by making an agreement with a hospital there. And in 2015, by empowering it to operate all over the nation. And that was a choice that they made to make it a non-local entity. And that suffices, I think, to decide the case. I just want to flag one other point, which is about eminent domain. You know, we have been trying to figure out whether or not there's any problem with our assertion that the hospital has to ask the Public Utility Commission to exercise eminent domain. We've made that really clear in our briefing below, in our briefing here. And we've gotten no response from the hospital to suggest otherwise. I don't know what public condemner means. I don't know what any of those words are meant to suggest. All I know is that unlike sanitary districts and unlike local governments, the hospital authority is specifically restricted by state law from using the eminent domain power without the say-so of an actual governmental entity. All right. Thank you. Oh! Judge, do you have questions? No, I didn't see any. Oh, my time has expired. Thank you very much. All right. Counsel, thank you so much for your argument. We appreciate that. We'd love to come down and shake your hand as our normal customer in the Fourth Circuit. In the circumstance, we can't do that. But know, nonetheless, that we appreciate very much your fine arguments being here today. And we're just asking that you will be safe and stay well. Thanks. It was an honor. Thank you, Counsel.
judges: Roger L. Gregory, Barbara Milano Keenan, A. Marvin Quattlebaum Jr.